**MACROVISION CORPORATION, Plaintiff,**

**v.**

**DWIGHT CAVENDISH DEVELOPMENTS LTD., Defendant.**

**No. C 99–20011 EAI.**

United States District Court, N.D. California. San Jose Division.

June 29, 2000.

Morgan Chu, Bruce A. Wessel, Marc J. Blau: Irell & Manella LLP Los Angeles, CA, for plaintiff.

Phillip J. McCabe, Shaen W. O'Dowd, Kevin G. Daley, Kenyon & Kenyon, San Jose, CA and Richard A. Cederoth, Marc E. Raven, Abby Rudzin Sidley & Austin, Chicago, IL, for defendant.

ORDER ADOPTING AND APPROVING REPORT OF SPECIAL MASTER REGARDING CLAIM CONSTRUCTION OF U.S. PATENT NUMBER 5,633,927

INFANTE, United States Magistrate Judge.*

## I. INTRODUCTION

In the present suit, Plaintiff Macrovision Corp. ("Macrovision") has asserted U.S. Patent No. 5,633,927 ("the '927 patent") against Defendant Dwight Cavendish Developments, Inc. ("Dwight Cavendish"). The parties did not agree upon the scope of the patent claims, requiring the court to interpret the disputed claims. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995)(en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). On December 6, 1999, in accordance with Rule 53 of the Federal Rules of Civil Procedure, the court appointed Allen M. Lo as a Special Master to assist in this task. The parties submitted claim constructions briefs, and Special Master Lo held a claim construction hearing on February 24, 2000.

Special Master Lo issued his Report on April 17, 2000. On May 1, 2000, Dwight Cavendish filed a Motion to Enter Report of Special Master, and on May 4, 2000 Macrovision filed a Motion to Modify Report of Special Master. The parties stipulated to a consolidated briefing schedule whereby Dwight Cavendish would oppose Macrovision's Motion to Modify and there would be one hearing for both motions. In accordance with this stipulation, a hearing

* Pursuant to Rule 73 of the Federal Rules of Civil Procedure, the parties consented to the exercise of civil jurisdiction over the case by a magistrate judge.

was held on June 26, 2000 on Dwight Cavendish's Motion to Enter Report of Special Master and on Macrovision's Motion to Modify Report of Special Master, and the parties appeared through their respective counsel of record. Having considered the briefs submitted by the parties, and the arguments of counsel, and for the foregoing reasons, Dwight Cavendish's Motion to Enter Report of Special Master is hereby GRANTED and Macrovision's Motion to Modify Report of Special Master is hereby DENIED.

## II. STANDARD OF REVIEW

Claim construction is a matter of law for the court, which is empowered and obligated to construe the meaning of the language used in the patent claim. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995)(en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). In reviewing a special master's conclusions of law, the district court conducts a de novo review. *Swoboda v. Pala Min., Inc.*, 844 F.2d 654 (9th Cir. 1988); *see also Oil, Chemical and Atomic Workers Intern. Union, AFL–CIO v. N.L.R. B.*, 547 F.2d 575, 580 (D.C.Cir. 1976)("a master's conclusions of law are entitled to no special deference from the reviewing court.") Accordingly, the court will conduct a de novo review of the Special Master's claim construction.

## III. LEGAL STANDARD FOR CLAIM CONSTRUCTION

Claim construction is a matter of law for the court, but claim construction is not an obligatory exercise in redundancy and therefore does not require the court to repeat or restate every claim term. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed.Cir.1997). Rather, the court must interpret only disputed terms. *Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.*, 103 F.3d 1571, 1583 (Fed.Cir.1997). Resolving the meaning of disputed terms allows the court to clarify and explain what the patentee covered by the claims. *U.S. Surgical*, 103 F.3d at 1568.

In interpreting disputed claim terms, the court should look first to the intrinsic evidence of record. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996.) Intrinsic evidence includes the language of the claims, the specification, and the file history, if in evidence. *Id.* Such intrinsic evidence is the most significant source of the legally operative meaning of the disputed claim language. *Id.* In most situations, analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. *Id.* at 1583.

The words of the claims themselves define the scope of the patented invention. *Vitronics*, 90 F.3d at 1582. Claim construction begins and ends in all cases with the actual words of the claim. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed.Cir.1998). Absent a special and particular definition created by the inventor, terms in a claim are to be given their ordinary and accustomed meaning. *Id.* at 1249. This holds true for technical terms as well, which are interpreted from the perspective of persons skilled in the art. *See Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866, 871 (Fed.Cir.1998). Ordinarily, a claim term expressed in general descriptive words will not be limited to a numerical range appearing in the specification or other claims. *Renishaw*, 158 F.3d at 1248.

To determine whether disputed terms have been used by the inventor in a manner other than their ordinary meaning, it is always necessary to review the specification. *Vitronics*, 90 F.3d at 1582. The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication. *Id.* A court may not resort to statements in the specification to construe a claim unless there is a claim term with which to draw in those statements. *Renishaw*, 158 F.3d at 1248.

The court may also consider the file history of the patent, if it is in evidence. *Vitronics,* 90 F.3d at 1582. The file history is often of critical significance in determining the meaning of the claims. *Id.* Any interpretation that is provided or disavowed in the file history shapes the claim scope. *Renishaw,* 158 F.3d at 1249 n. 3.

In addition to intrinsic evidence, a court may rely on extrinsic evidence to construe claims, but only where the intrinsic evidence alone does not resolve the ambiguity in a disputed claim term. *Vitronics,* 90 F.3d at 1583. Extrinsic evidence may not be used to vary or contradict the claim language. *Id.* at 1584. A court may, however, examine or consult extrinsic evidence to ensure that its claim construction based on intrinsic evidence is not inconsistent with how a person skilled in the art would understand the claim terms. *Pitney Bowes, Inc. v. Hewlett–Packard Co.,* 182 F.3d 1298, 1308–09 (Fed. Cir.1999). Extrinsic evidence refers to evidence that is external to the patent and its file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles. *Vitronics,* 90 F.3d at 1584. The court may freely consult dictionaries and technical treatises at any time to better understand the technology and may rely on dictionary definitions when construing claims, so long as the dictionary definition does not contradict any definition found in the patent documents. *Id.* at 1584, n. 6.

## IV. DISCUSSION

The Special Master's report construed four disputed terms. Macrovision filed objections to the Special Master's report, but only as to the recommended interpretation for the term "defeating the effects of a video anti-copy process" ("the defeating phrase") in Claim One. The Special Master recommends that the defeating phrase be construed to mean: "circumventing a copy protection process to produce a watchable copy." Macrovision objects, proposing the alternative construction of "defeating some or all of the

effects of a video anti-copy process and includes reducing the effects of a video anti-copy process." Dwight Cavendish, on the other hand, urges that the Special Master is correct. Thus, the dispute centers around whether the '927 patent covers technology that reduces negative side effects on the original videotape (as Macrovision contends) or only technology that counteracts the anti-copying process (as Dwight Cavendish contends). For the reasons that follow, the court finds that the disputed phrase means "circumventing a copy protection process to produce a watchable copy."

### A. The Plain Meaning of the Words in the Claim Support a Construction of "Circumventing a Copy Protection Process to Produce a Watchable Copy"

"The words of the claims themselves define the scope of the patented invention." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996); *see also Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1248 (Fed. Cir.1998). In this case, the words "the effects" do not specify or exclude any specific types of effects. Instead, the term "the effects" is plural and all inclusive. Thus, it follows that "the effects" means all the effects, and the words of the claim provide no basis for interpreting "the effects" to mean "some or all of the effects."

Macrovision objects to this construction because it requires the addition of the words "to produce a watchable copy." Macrovision's argument is unavailing in light of the additional words in the construction that it asserts. Macrovision urges adding the words "and includes reducing the effects of a video copy process." The plain meaning of the words does not support this construction because it not only adds words, it adds a new concept, that of decreasing negative unintended side effects. Macrovision also asserts that this construction is invalid because it improperly adds a modifier "all" to the term "the effects." This construction, however,

does not add a modifier. Instead, it recognizes that the word "the" modifies "effects," to produce a phrase that is all-inclusive. Accordingly, the plain meaning favors the construction "circumventing a copy protection process to produce a watchable copy."

## B. The Different Words Used in Claim One and Claim Six Do Not Require Different Constructions

Macrovision argues that a comparison of Claims One and Six shows that the defeating phrase in Claim One should not be construed to mean "to produce a watchable copy." The preamble to Claim One asserts "[a] method of defeating the effects of a video anti-copy process" while Claim Six covers "[a] method of defeating a video copy protection process . . . thereby enabling recording a viewable copy of the video signal." Macrovision asserts that these differences were intentional and intended to make Claim One broader than Claim Six.

### 1. *Claim Differentiation Doctrine Does Not Apply*

■■■ The doctrine of Claim Differentiation assumes that different claims have different scopes, and creates a presumption that different words have different meanings. The presumption that different words have different meanings, however, only applies if the absence of the different meanings would render one claim superfluous. *Tandon Corp. v. U.S. International Trade Commission*, 831 F.2d 1017, 1023 (Fed.Cir.1987). In this case, the presumption does not apply because construing the preamble of Claim One to have the same meaning as the preamble of Claim Six would not render either claim superfluous as multiple differences exist between the

two claims.[1] Moreover, the intrinsic and extrinsic evidence in this case show that "defeating the effects of a video anti-copy process" and "defeating a video copy protection process" have the same meaning and overcomes any presumption that would have been created by the doctrine of claim differentiation.

### 2. *The Different Words In Claims One and Six Do Not Require Different Meanings*

■■■ Although it is unclear whether Macrovision argues that claim differentiation applies, it is clear that Macrovision attempts to rely upon the logic underlying the claim differentiation doctrine. Macrovision argues that it is invoking the "common sense notion" underlying the claim differentiation doctrine that "different words or phrases used in separate claims are presumed to indicate that the claims have different meaning and scope." (Mot. to Modify at 5:26–6:2, *quoting Karlin Technology Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971 (Fed.Cir.1999)). The notion that different claims are presumed to have different meanings, however, does not mean that different words must have different meanings. In fact, courts have recognized that different words do not require different interpretations:

> That the patentee chose several words in drafting a particular limitation of one claim, but fewer (though similar) words in drafting the corresponding limitation in another, does not mandate different interpretations of the two limitations, since "defining a state of affairs with multiple terms should help, rather than hinder, understanding." *Bell & Howell Doc. Management Prods. Co. v. Altek Sys.*, 132 F.3d 701, 707, 45 USPQ2d

---

1. Claim one states "A method of defeating the effects of a video anti-copy process that adds pulses to blanking intervals of a video signal comprising replacing a back porch portion of the video signal having an amplitude at blanking level with a signal having an amplitude below the blanking level." In contrast, Claim Six states: "A method of defeating a video copy protection process that adds paired negative and positive going pulses to blanking intervals of a video signal, the method thereby enabling recording a viewable copy of the video signal comprising the steps of: determining a particular portion of at least some video lines of the video signal, the added pulses being present in the particular portion; and reducing a level of the particular portion to below a blanking level of the video signal."

1033, 1039 (Fed.Cir.1997). Moreover, that the claims are presumed to differ in scope does not mean that every limitation must be distinguished from its counterpart in another claim, but only that at least one limitation must differ. *See Mantech Envtl. Corp. v. Hudson Envtl. Servs.*, 152 F.3d 1368, 1376, 47 USPQ2d 1732, 1739 (Fed.Cir.1998)

*Kraft Foods, Inc. v. International Trading Co.*, 203 F.3d 1362, 1368 (Fed.Cir.2000). Thus, the fact that Claim One uses different words from Claim Six does not require that the difference have meaning. *See also Tandon*, 831 F.2d at 1023 (construing "relatively fixed," "fixed" and "fixedly coupled" all to mean "fixed in all directions.")

## C. The Specification Supports the "Circumventing a Copy Protection Process to Produce a Watchable Copy" Construction

The specification is properly used to define claims terms. *Vitronics Corp.*, 90 F.3d at 1582. In the '927 specification, several passages are directed to circumventing the copy protection process. For example, the specification states that "disclosed herein in accordance with the invention are several methods and apparatuses for removal or 'defeat' of the above-described video signal modifications, *to permit unhampered copying and viewing thereof*." ('927 patent, col 5, lines 26–29)(emphasis added). Similarly, the specification states that figure 15:

> shows a two step circuit and method for *removing all the above-described anticopy protection signals*. A video signal ... is first input on terminal 228 into the circuitry ... to defeat the effects of the AGC pulses and pseudo-sync pulses. Second, the output signal from circuitry 230 is input into the enhancement remover 234 which *defeats* the checker and vertical pulses, *and also defeats* sync narrowing and any residual AGC pulse of pseudo-sync pulses in the horizontal blanking interval. *The video and signal*

*at terminal 236 is thus free of all effects of copy protection signals.*

('927 patent, col 23:14–26.)(emphasized.) *See also* '927 patent, col 23:14–26 ("the circuit of FIG. 39a reduces or removes the effect of the PPS pulses, rendering the video signal recordable").

Macrovision argues that the specification supports its construction. As support for this position, Macrovision points to column 32, which states:

> Method and Apparatus for *Reducing Effects* of Basic Anticopy Process Signals
>
> The following describes a method and apparatus in which the basic anti-copy process signals consisting of pseudo sync and AGC (i.e. basic anticopy process) added pulses (as described above) are *reduced in effectiveness* without altering these added pulses. Unlike the above described previous methods for altering the added pulses via amplitude attenuation, level shifting or pulse narrowing to offset the added pulses' effect, the present method reduces the effects of added pulses by further adding other pulses that counteract the gain reduction caused by the AGC and pseudosync pulses.

('927 patent, col 32, lines 19–31.) Macrovision argues that the use of the words "reducing" and "reduced" mandate the inclusion of a partial elimination in order to improve watchability of the original tape. This construction is not supported by the language of the specification. The gain reduction discussed refers to the technology in U.S. Patent number 4,631,603 ("the '603 patent") which affects the automatic gain control system in a VCR to cause an unacceptable recording of the video signal. ('603 Patent Col 2:21–29, Exh. 6 to Dwight Cavendish's Response to Opening Claim construction Brief) Thus, when read in context, the cited portion refers to defeating the copy protection process, and not to negative side effects on the original tape.[2] Accordingly, the speci-

---

2. Macrovision also argues that Dwight Cavendish's expert, Bernard Lechner, agreed with Macrovision's construction that reducing the effects is covered by claim one. (Reply at 2:15–28.) However, the expert testified that

fication supports the "circumventing a copy protection process to produce a watchable copy" construction.

### D. The "Circumventing a Copy Protection Process to Produce a Watchable Copy" Construction Does Not Improperly Limit Claim One to Examples in the Specification

Macrovision argues that the construction of "Circumventing a Copy Protection Process to Produce a Watchable Copy" improperly limits Claim One to the examples in the specification. While it would be incorrect to limit Claim One to examples in the specification, it is equally true that the specification acts as a dictionary for the claim terms. *Vitronics,* 90 F.3d at 1582; *Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1478 (Fed.Cir.1998). In this case, the specification of the '927 patent uses the term "defeating the effects" in only one way—to mean circumventing copy protection. In fact, Macrovision conceded at the claim construction hearing that the specification does not support interpreting "defeating the effects" to mean reducing side effects on the original tape. Macrovision stated: "And we will concede, as Dwight Cavendish pointed out, there isn't a portion of the specification that we can say here is a section of the specification that talks about reducing the effects to improve the playability of the original tape. That's not in the specification and we're not contending that it is." (Joint App. Exh. B, Hearing Tr. at 30:23–31:4). Thus, the "Circumventing a Copy Protection Process to Produce a Watchable Copy" construction does not improperly limit Claim One to examples in the specification. Instead, it refuses to expand

claim one in a manner inconsistent with the use of the term throughout the entire contents of the specification.[3]

### E. The Extrinsic Evidence Supports the "Circumventing a Copy Protection Process to Produce a Watchable Copy" Construction

Extrinsic evidence may be used to ensure that the claim construction based on intrinsic evidence is not inconsistent with how a person skilled in the art would understand the claim terms. *Pitney Bowes, Inc. v. Hewlett–Packard Co.,* 182 F.3d 1298, 1308–09 (Fed.Cir.1999). In connection with several other patents, Macrovision has used the term "defeating the effects" to refer to circumventing copy protection. For example, in relation to U.S. Patent No. 5,953,417 ("the '417 patent"), Macrovision told the Patent Office that "defeating the effects" means circumventing copy protection to create a watchable copy. Specifically, the '417 patent states:

> The methods and apparatuses for digitally removing or *defeating effects of copy protection signals* include modifying less than all of the lines in which the copy protection signals are present, but sufficient of the lines *so that the acceptable video recording can be made.* Also defeating can include modifying sufficient portions of AGC pulses, pseudo sync pulses and/or chroma copy protection signals (i.e. Colorstripe) *for a recordable copy.*

'417 patent, col. 6, lines 53–60 (emphasis added). Similarly, in relation to U.S. Patent No. 5,784,523 ("the '523 patent"), Macrovision stated:

reducing meant "reducing sufficiently that the resulting signal is acceptable for viewing." Lechner Dep. at 114:25–115:20 Thus, Dwight Cavendish's expert did not contradict the "circumventing a copy protection process to produce a watchable copy" construction. Instead, his testimony is consistent with this construction and provides no assistance to the construction which would include reducing unintended side effects on the original tape.

3. The file history also contains no support for the construing "defeating the effects" to mean defeating or reducing some or all of the effects. The Patent Examiner treated "defeating the effects of a video anti-copy process" as synonymous with "defeating" copy protection. Thus, the court's construction is consistent with both the specification and the file history.

It is to be understood that herein the terms "copiable" and "recordable" both mean that the resulting video signal, when recorded by a VCR and then played back, provides a viewable television picture without substantial hue defects due to the color strip process [i.e. another form of copy protection]. *Thus these terms refer to effective elimination (defeat) of the effect of the color stripe process in terms of viewability of the video signal.*

'523 patent, col 10, lines 54–60 (emphasis added). Thus, the extrinsic evidence is consistent with the plain meaning of "defeating the effects of a video anti-copy process" as "circumventing copy protection process to produce a watchable copy."

## V. ORDER

For the foregoing reasons, the phrase "defeating the effects of a video anti-copy process" is construed to mean: "circumventing a copy protection process to produce a watchable copy." Accordingly, it is hereby ORDERED that the Motion of Dwight Cavendish to Enter the Report of the Special Master is GRANTED and the Motion of Macrovision to Modify the Report of the Special Master is DENIED.

IT IS SO ORDERED.